1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   APPLE HILL GROWERS,                    No.  2:17-cv-02085 DJC CKD

12              Plaintiff,

13        v.                                FINDINGS AND RECOMMENDATIONS

14   EL DORADO ORCHARDS, INC., et al.,

15              Defendants.

16

17        Plaintiff Apple Hill Growers (AHG) brought this action for trademark infringement

18   against defendant El Dorado Orchards, Inc. (EDO) and individual defendants Brad and Kandi

19   Visman, officers of defendant EDO ("the Vismans").[1]  This action proceeds on the First

20   Amended Complaint (FAC).  (ECF No. 17.)  Before the court are the parties' cross-motions for

21   summary judgment.  (ECF Nos. 77 & 79.)  Each party has filed an opposition, ECF Nos. 80 & 82,

22   and a reply, ECF Nos. 87 & 88.  On April 4, 2023, the motions were submitted without oral

23   argument.  (ECF No. 101.)  For the reasons set forth below, the undersigned recommends that

24   plaintiff's motion be denied, and defendants' motion be granted in part and denied in part.

25   ////

26

27   [1] The Vismans' son Mason Visman was one of the original defendants, but is now deceased.
     (ECF No. 97.)  Brad Visman has been substituted as Special Administrator for the Estate of
28   Mason Visman for purposes of this action.  (ECF No. 99.)

1

1    I.    BACKGROUND

2    A. Factual Disputes and Evidentiary Objections

3    The following facts are undisputed unless otherwise stated. Where a genuine dispute

4    exists, the court draws reasonable inferences in favor of the non-moving party. Tolan v. Cotton,

5    134 S. Ct. 1861, 1868 (2014). This is true even where cross-motions are filed, as each motion

6    must be considered on its own merits. Nat'l Grange of the Order of Patrons of Husbandry v.

7    California State Grange, 115 F. Supp. 3d 1171, 1177 (E.D. Cal. 2015), aff'd, 715 F. App'x 747

8    (9th Cir. 2018). Parties may object to the evidence cited by another party to prove the undisputed

9    facts. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 385–86 (9th Cir. 2010). But the evidentiary

10    admission standard at summary judgment is lenient: A court may evaluate evidence in an

11    inadmissible form if the evidentiary objections could be cured at trial. See Burch v. Regents of

12    the Univ. of Cal., 433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006). "Admissibility at trial"

13    depends not on the evidence's form, but on its content. Block v. City of L.A., 253 F.3d 410, 418–

14    19 (9th Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

15    B. Factual and Procedural Background

16    This is a trademark infringement case alleging unauthorized use of plaintiff AHG's

17    registered APPLE HILL mark.

18    AHG is a growers' association in El Dorado County with more than fifty members who

19    operate farms, ranches, and/or wineries. Defs' Undisp. Facts ("DF") 1, 2, ECF No. 83-1; Plff's

20    Undisp. Facts ("PF") 1, ECF No. 79-2. In July 1964, in the region east of Placerville, a group of

21    farmers who had lost pear orchards to disease and planted apple trees as their replacement, met

22    and formed an association to promote direct "ranch sales" of their agricultural produce to the

23    public. PF 5. At the meeting, the farmers coined the term "Apple Hill" to identify their

24    organization and products. PF 6. AHG first used the term "Apple Hill" in 1964, when the phrase

25    had no geographical significance to the consuming public. DF 3, PF 6.

26    AHG's continuous use of APPLE HILL as a trademark dates back to 1964, when it

27    distributed tens of thousands of promotional litterbags featuring maps of AHG farms to the public

28    at the 1964 California State Fair. PF 8. AHG members began selling baked goods and other farm

products as packaged goods marked with the APPLE HILL mark, and members' cookbooks labelled with the APPLE HILL mark were sold to the public starting in 1989.  PF 9.

AHG owns U.S. trademark registration no. 1945541 for the mark APPLE HILL (the '541 Reg. ); it was issued in January 1996 and covers certain fresh fruits and fruit juices.  FAC, ¶ 19; DF 4-5.  AHG also owns U.S. trademark registration no. 5034321 for the mark APPLE HILL (the '321 Reg.); it was issued in September 2016 and covers cookbooks, printed guides for visitors to fruit orchards, fruit pies, live Christmas trees, and assorted other items.  FAC, ¶ 20; DF 7, 8.  AHG itself does not make or sell fresh fruit, bakery items and other goods covered by the '541 and '321 registrations.  DF 16, 18.  Rather, it licenses the APPLE HILL mark to its members for use on these items.  DF 17, 19.  AHG maintains a website at applehill.com.  DF 28.

EDO is a family-owned farming business in Placerville, California; the Vismans are its president and secretary/treasurer. DF 33, 34, 35.  Under the name of Boa Vista Orchards, EDO operates a year-round farmstand that sells baked goods, cider, jams, and other products with a Boa Vista Orchards label.  DF 36, 37.  In 1964, EDO was one of the founding members of AHG.  DF 40, 41.

In 2013, AHG learned that Brad Visman had filed two applications with the U. S. Patent and Trademark Office (USPTO) to register the trademark APPLE HILL (one for beer, and the other for alcoholic beverages except beer, liquor, and spirits).  The AHG Board considered these acts to be a violation of the AHG bylaws and a breach of the restrictions on permitted uses of the APPLE HILL trademark.  PF 18.  The USPTO refused both applications based on AHG's existing '541 registration for APPLE HILL.  PF 19.  The ensuing dispute resulted in AHG voting, in February 2014, to revoke EDO's membership in AHG, and AHG signs were removed from Boa Vista Orchards.  PF 20, 21, 22.  Plaintiff's position is that defendants' licenses to use the APPLE HILL mark were terminated when their AHG membership ended.

Mason Visman ("Mason"), the Vismans' son, was an independent contractor of EDO who was not involved in the day-to-day operations of the business.  DF 52, 54, 57, 58.  In March 2014, Mason registered the domain name applehillca.com, used in connection with URL address www.applehillca.com, and operated the website.  PF 27.  In a July 2022 declaration, Mason stated

3

1  that he operated the Apple Hill website independently of EDO and that it had no input into the

2  contents of his site.  (Mason Visman Dl., ¶ 9, ECF No. 77-5.)  In 2011 or 2012, Mason stated, he

3  decided that he could do a better job promoting Apple Hill than AHG, and built a website to

4  "provide more information and options to potential visitors to the area."  (Id., ¶ 11.) Mason

5  declared that his "intention was to focus on the geographic nature of the area, not AHG."  (Id., ¶

6  13.)  The applehillca.com website displayed the term "Apple Hill" on multiple web pages,

7  including many links to defendants' Boa Vista Orchards website at www.boavista.com.  PF 39.

8      Since February 2014, the Boa Vista Orchards website, www.boavista.com, has also

9  contained multiple references to Apple Hill, including titles, names, and keywords which are

10  visible to the consuming public.  PF 26.  From February 2014 through at least July 2022,

11  defendant EDO sold products bearing the label "Apple Hill Family Farm" in advertising, point of

12  sale displays, and product labels and containers.  PF 23; Defs.' Response to PF (DPF) 23, ECF

13  No. 82-1.  EDO also used the term "Apple Hill Family Farm" on printed guides distributed to the

14  public and on the Boa Vista website.  PF 24, 25; DPF 24.  In a July 2022 declaration, Brad

15  Visman stated that "[f]or some time, [EDO] has been phasing out this use as new labels and

16  cartons are printed."  DF 39; see B. Visman Decl., ¶ 5, ECF No. 77-7.

17      Presently, and for many years, CalTrans has had road signs on Highway 50 that direct cars

18  to the exits for the "Apple Hill Area."  DF 29.

19      AHG commenced the instant action by filing a complaint on October 9, 2017.  (ECF No.

20  1.)  This action proceeds on the FAC filed November 29, 2019.  (ECF NO. 17.)  The FAC asserts

21  claims under the Lanham Act for trademark infringement and false designation of origin, 15

22  U.S.C. §§ 1114, 1125(a); claims under the Anti-Cybersquatting Consumer Protection Act, 15

23  U.S.C. § 1125(d), for defendants' websites; and California statutory and common law claims of

24  unfair competition.  (FAC at 13-18.)  As to the Lanham Act claims, AHG alleges it is "entitled to

25  Defendants' profits, Plaintiff's damages, costs, and attorney's fees, pursuant to 15 U.S.C. Section

26  1117."  (FAC ¶¶ 60, 66.)

27      Defendants counterclaim for cancellation of AHG's trademark registrations, unfair

28  competition, unjust enrichment, and unlawful group boycott (based on AHG prohibiting its

4

1    members from doing business with Mason Visman).  (ECF No. 25 at 9-16.)  Defendants also

2    assert affirmative defenses of fair use, trademark misuse, laches, and unclean hands.  Id. at 6-9.

3    In their Answer and Counterclaim, defendants claim that EDO "uses its Boa Vista Logo, the twin

4    apple logo, and the term Apple Hill fairly to describe the geographic location of its farm." (ECF

5    No. 25 at 3, Answer ¶ 32.)  Defendants also assert ownership of Federal Registration No.

6    4,682,963 for APPLE HILL for advertising and directory services limited to "goods and services

7    originating in the Apple Hill area of California." (Id. at 10, 20.)

8         Overall, plaintiff views this as a clear-cut case of trademark infringement.  Its position is

9    that, while non-AHG growers "can advertise that they are located in Camino, Placerville or

10   Pollock Pines"—i.e., cities and census-designated locations—they cannot use the APPLE HILL

11   trademark without permission from AHG, because that would constitute trademark infringement.

12   (ECF No. 87 at 6.)  The proposed ban includes "confusingly similar variants such as APPLE

13   HILL FARM or APPLE HILL FAMILY FARM."  (Id.)

14        Defendants counter: "AHG apparently believe that because it originally coined the term

15   Apple Hill and has used it for many years, it is the sole and exclusive person who can provide

16   information about Apple Hill to the public. . . . But that is not the way trademark law works."

17   (ECF No. 82 at 19.)  Defendants assert that "[t]his case is about whether there is or is not an

18   Apple Hill Growing Area, whether Apple Hill is a trademark (i.e. a single source identifier),

19   whether [AHG]'s trademark registrations are valid, [and] whether [AHG] has a lawful monopoly

20   over all uses of Apple Hill."  (ECF No. 25, Defs.' Answer and Counterclaims, ¶ 8.)

21   II.    LEGAL STANDARD

22        A court will grant summary judgment "if ... there is no genuine dispute as to any material

23   fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The

24   "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

25   only by a finder of fact because they may reasonably be resolved in favor of either party."

26   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

27        In determining summary judgment, a court uses a burden-shifting scheme.  The moving

28   party must first satisfy its initial burden, which requires "com[ing] forward with evidence which

1    would entitle it to a directed verdict if the evidence went uncontroverted at trial." C.A.R. Transp.

2    Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000) (citation and quotation

3    marks omitted).  If the moving party fails to meet its initial burden, summary judgment must be

4    denied and the court need not consider the nonmoving party's evidence.  See Adickes v. S.H.

5    Kress & Co., 398 U.S. 144 (1970).  If the moving party meets its initial burden, however, the

6    burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of

7    material fact." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986).  To

8    carry their burdens, both parties must "cit[e] to particular parts of materials in the record ...; or

9    show [ ] that the materials cited do not establish the absence or presence of a genuine dispute, or

10   that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

11   56(c)(1); see also Matsushita, 475 U.S. at 586 ("[The nonmoving party] must do more than

12   simply show that there is some metaphysical doubt as to the material facts.").  Moreover, "the

13   requirement is that there be no genuine issue of material fact .... Only disputes over facts that

14   might affect the outcome of the suit under the governing law will properly preclude the entry of

15   summary judgment." Anderson, 477 U.S. at 247–48.

16          In deciding summary judgment, the court draws all inferences and views all evidence in

17   the light most favorable to the nonmoving party.  Matsushita, 475 U.S. at 587–88; Whitman v.

18   Mineta, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a whole could not lead a

19   rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "

20   Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253,

21   289 (1968)). The Supreme Court has taken care to note that district courts should act "with

22   caution in granting summary judgment," and have authority to "deny summary judgment in a case

23   where there is reason to believe the better course would be to proceed to a full trial." Anderson,

24   477 U.S. at 255.

25          "[S]ummary judgment is generally disfavored in the trademark arena." Zobmondo

26   Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010) (quoting KP Permanent

27   Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005) (other citation

28   omitted).

6

III.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff AHG moves for partial summary judgment on Count I for Infringement of Federally Registered Trademarks (against all defendants except the Estate of Mason Visman); Count II for Trademark Infringement and False Designation of Origin (against all defendants); and Count III for Violation of the Anti-Cypersquatting Consumer Protection Act (only against the Estate of Mason Visman) as set forth in the FAC.  (ECF No. 79-1 at 5.)

Defendants move for summary judgment on all claims and argue that AHG's trademark registrations should be cancelled.  (ECF No. 77-1.)

A.  Count I: Trademark Infringement under § 1114

AHG asserts that since February 2014 the Vismans and EDO have unlawfully used the registered trademark APPLE HILL without AHG's consent, in a manner that is likely to cause confusion, mistake, or deception among ordinary consumers.  Specifically, AHG alleges that defendants "continue to sell many products from their Boa Vista Orchards location in containers labeled with their own Boa Vista Orchards name, 'twin apple logo,' and the APPLE HILL mark. (FAC, ¶31; see ECF No. 79-3, Boeger Decl., Exh. 11 (2016 photos of Boa Vista Orchards products labelled "Apple Hill Family Farm")).  Defendant EDO admits to using the Boa Vista logo, the twin apple logo and the term "Apple Hill" on their products "to describe the geographic location of its farm."  (Answer, ¶ 31.)

To prevail on its trademark infringement claim under § 1114 of the Lanham Act, a plaintiff must prove: "(1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion."  Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1202 (9th Cir.2012) (internal quotation marks and citation omitted).

1.  Validity of the Trademark

To claim trademark infringement, a plaintiff must have a "valid, protectable trademark." Zobmondo Entm't, 602 F.3d at 1113 (citation omitted).  The issue of trademark validity is considered "an intensely factual issue."  Id. (quoting KP Permanent Make–Up, 408 F.3d at 605). The plaintiff bears the ultimate burden of proof in a trademark infringement action that the

1    trademark is valid and protectable.  Id. (citing Yellow Cab Co. of Sacramento v. Yellow Cab of

2    Elk Grove, Inc., 419 F.3d 925, 927–28 (9th Cir. 2005)).  "Federal registration of a mark

3    constitutes prima facie evidence of the validity of the mark."  Yellow Cab Co. of Sacramento, 419

4    F.3d 925 at 928.  "If the plaintiff establishes that a mark has been properly registered, the burden

5    shifts to the defendant to show by a preponderance of the evidence that the mark is not

6    protectable."  Zobmondo Entm't, 602 F.3d at 1114.

7         As set forth above, plaintiff has two registered trademarks for APPLE HILL: the '541

8    registration issued in 1996 that covers certain fresh fruits and fruit juice; and the '321 registration

9    issued in 2016 that covers cookbooks, printed visitor guides, fruit pies, and assorted other items.

10   The parties agree that the '541 registration is incontestable pursuant to 15 U.S.C. § 1065, which is

11   considered conclusive evidence of its validity, legal protectability, and ownership in the

12   infringement analysis.  See New Balance Athletics, Inc. v. USA New Bunren Int'l Co., 424 F.

13   Supp. 3d 334, 346 (D. Del. 2019).  The '321 Registration is not incontestable, but provides prima

14   facie evidence of validity of the mark, and the burden shifts to defendants to show it is invalid.

15        Along with the presumed validity of the '321 Reg., AHG asserts that its rights in the

16   APPLE HILL trademark are based upon promotion and sales of goods with the APPLE HILL

17   label, both by AHG itself and its members under license.  (ECF No. 79-1 at 11.)

18        A key issue is whether the APPLE HILL mark is distinctive enough to be protectable in

19   trademark.  To be valid and protectable, a mark must be "distinctive."  Distinctiveness measures

20   the primary significance of the mark to the purchasing public.  Zobmodo, 602 F.3d at 1113

21   (citations omitted).  In determining distinctiveness, "the fact-finder's function is to determine,

22   based on the evidence before it, what the perception of the purchasing public is."  Id. (citation

23   omitted).  Marks are generally classified in one of five categories of increasing distinctiveness:

24   (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.  Id. (quoting Two Pesos,

25   Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, (1992)).  Descriptive terms describe a person, a

26   place or an attribute of a product.  Japan Telecom, Inc. v. Japan Telecom America Inc., 287 F.3d

27   866, 872 (9th Cir. 2002) (citation omitted).  "They suffer from the same problem as generic

28   terms: Because they tend to consist of common words that might be the only way to describe a

8

1    category of goods, we do not grant exclusive property rights in them." Id. (citation omitted).

2    "Nonetheless, a descriptive term can become protectable provided that it has acquired 'secondary

3    meaning' in the minds of consumers, i.e., it has become distinctive of the trademark applicant's

4    goods in commerce." Id. (internal quotations and citation omitted).

5         Defendants assert that even if the term Apple Hill was inherently distinctive in 1965, it no

6    longer is. They contend that while the term began as a trademark for goods, the public now

7    associates it with a place in El Dorado County, making it a geographically descriptive term.[2]

8         "A geographically descriptive term or phrase is one that designates a geographical

9    location and would tend to be regarded by buyers as descriptive of the geographic location of

10   origin of the goods or services." Weintraub v. Sotheby's Int'l Realty, Inc., 2018 WL 6421687, *3

11   (C.D. Cal. Nov. 1, 2018) (quoting Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC, 680

12   F.Supp.2d 1107 (N.D. Cal. 2010); see Ninth Circuit Civil Jury Instructions (Trademark) § 15.10

13   (geographically descriptive trademark describes where the product comes from). The relevant

14   inquiry into whether a term is geographically descriptive is "whether, upon consideration of all

15   terms comprising a composite mark, the term is being used geographically." Id. (quoting Japan

16   Telecom., 287 F.3d at 871).

17        Defendants cite the CalTrans road signs on Highway 50 that direct cars to exits for the

18   "Apple Hill Area" as evidence that the term is geographically descriptive. (DF 29.) They note

19   that AHG's 1969 Articles of Incorporation characterize Apple Hill as a place, stating that AHG's

20   "general purposes and powers are to promote the Apple Hill area in all respects and to cooperate

21   in accomplishing the improvement of said area[.]" (Delfino Decl., ¶ 4, Exh. 1, ECF No. 79-4.)

22   In an online market research study conducted in 2022 at defendants' behest, "many respondents

23   spontaneously reported the belief that Apple Hill is a location or a place." (ECF No. 82-2, Ezell

24   Dec., ¶ 17.)

25        Defendants also point out that twice during the trademark application process that resulted

26

27   [2] Defendants do not argue that the term has become entirely geographical, but rather, that it has
     "dual meaning": associated in the public mind with both a place and a trademark. (ECF No. 82 at
28   19.)

1    in the '321 Reg, the USPTO refused registration of the mark on the grounds that it was primarily

2    geographically descriptive.  In its August 2015 Office Action refusing registration, the USPTO

3    stated that "Apple Hill is known as the area in El Dorado County, California, in and around the

4    community of Camino."  (DF 9; Reidl. Decl. ¶ 2, Exh. 1, ECF No. 77-3.)  In January 2016, in

5    response to the Office Action, AHG stated that "APPLE HILL is in fact a coined term which,

6    through advertising, promotion, and recognition by the public of that term, has become associated

7    with a physical region or location.  However, that association . . . does not transform APPLE

8    HILL into a *primarily* geographically descriptive term under the law."  (Reidl. Decl., ¶ 4, Exh. 2)

9    (emphasis in original).

10        In February 2016, the USPTO again refused registration of the application that resulted in

11   the '321 trademark because "the mark is primarily geographically descriptive."  (Reidl. Decl. ¶ 5,

12   Exh. 3.)  In its March 2016 response, AHG argued that "a coined term which later becomes

13   associated with a specifically physical location is not primarily geographically descriptive under

14   the Act[.] . . . APPLE HILL is such a coined term."  (Reidl. Decl. ¶ 6, Exh. 4.)  AHG

15   subsequently submitted evidence of inherent distinctiveness to overcome the USPTO's refusal to

16   register.  (Straight Decl., ¶¶ 6-7, Exh. 3, ECF No. 83-4.)  After receiving this additional evidence,

17   the USPTO determined that the APPLE HILL mark was inherently distinctive, and the mark was

18   registered in September 2016.  (Straight Decl., ¶ 7, Exh. 2.)

19        In sum, the parties generally agree that, due to AHG's decades of promotional efforts, the

20   term Apple Hill is associated in the public mind both with AHG members' products and a

21   geographical location.  Though plaintiff argues that the mark does not "primarily" refer to a place,

22   the evidence compels the conclusion that APPLE HILL is geographically descriptive.

23        The next key issue is secondary meaning.  See Japan Telecom, Inc. 287 F.3d at 873

24   ("Secondary meaning is a question of fact[.]")  Because APPLE HILL is geographically

25   descriptive, it is not protectable unless the name has acquired secondary meaning in the market.

26   "This requires showing that there is a mental recognition in buyers' and potential buyers' minds

27   that products connected with the mark are associated with the same source."  Id. (internal

28   quotation marks and citation omitted).  To determine whether a descriptive mark has secondary

10

1  meaning, a finder of fact considers multiple factors, including: (1) whether actual purchasers of

2  the product bearing the claimed trademark associate the trademark with the producer, (2) the

3  degree and manner of advertising under the claimed trademark, (3) the length and manner of use

4  of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.

5  Yellow Cab Co. of Sacramento, 419 F.3d at 930 (citation omitted).

6         Because the '321 Reg. is registered, APPLE HILL carries a presumption of secondary

7  meaning, because registered marks are presumed distinctive.  See Americana Trading, Inc. v.

8  Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992); Ninth Circuit Civil Jury Instructions

9  (Trademark) § 15.11 (Comment).  In such a case, it is defendants' burden to prove that secondary

10 meaning has not attached such that the registered mark is not entitled to trademark protection.  Id.

11        Does the consuming public associate the term Apple Hill with AHG?  In 2022,

12 defendants' market research expert conducted an online survey to determine whether regional

13 consumers[3] who viewed a Boa Vista apple juice label featuring the phrase "Apple Hill Family

14 Farm" believed the juice came from or was associated with AHG.  (Ezell Decl., ¶¶ 2, 11,

15 Appendix A, ECF No. 82-2.)  See Prudential Ins. Co. of Am. V. Gibraltar Fin. Corp. of

16 California, 694 F.2d 1150, 1156 (9th Cir. 1982) ("Surveys are admissible, if relevant, either as

17 nonhearsay or through a hearsay exception.")  Out of 205 individuals who viewed the Boa Vista

18 label, only one respondent (or 0.5%) reported the belief that juice bearing the name "Apple Hill"

19 came from or was affiliated with AHG.  (Id., ¶ 16.)  To the extent this survey is probative, it is

20 evidence that the term "Apple Hill" lacks secondary meaning to the consuming public.

21        Plaintiff argues that defendants' survey was flawed in multiple ways and has little or no

22 probative value.  Plaintiff points out that the survey was limited to apple juice although AHG

23 members produce numerous other products, and that it was conducted online rather than in the

24 "real-world setting" of a farm or roadside stand where consumers actually purchase goods.  See

25 YKK Corp. v. Jungwoo Zipper Co., Ltd., 213 F.Supp.2d 1195, 1203 (C.D. Cal. 2002). abrogation

26 _____

27 [3] The survey universe "consisted of males and females 18 years of age or older who reside in the
   Sacramento-Stockton-Modesto or the San Francisco-San Jose areas of California and who
   indicated that they were likely to purchase apple juice in the next three months."  (Ezell Decl., ¶
28 10.)

1    on other grounds recognized in DenimXworks Inc. v. J.L.J., Inc., 2010 WL 11596164, *3 n. 3

2    (C.D. Cal. 2010) (survey evidence is evidence of "actual confusion" in trademark context only to

3    the extent the survey replicates real world setting which can create an instance of actual

4    confusion).  Moreover, in addition to its presumptive secondary meaning, AHG's "long,

5    continued use of the mark" for decades and "extensive and expensive advertising and promotion

6    of products bearing the mark" favor a finding that it has acquired secondary meaning.  E. & J.

7    Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992).

8         Ultimately, absent a conclusive showing on summary judgment, secondary meaning is a

9    question of fact for the jury.  When viewed in the light most favorable to nonmoving party

10   defendants, the evidence creates a genuine issue of material fact concerning whether the APPLE

11   HILL mark has acquired secondary meaning.

12        2.  Consumer Confusion

13        The second element of a trademark infringement claim requires plaintiff to show that "a

14   reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source

15   of the goods or services bearing one of the marks or names at issue in the case."  Rearden, 683

16   F.3d at 1209.

17        To analyze likelihood of confusion, the Ninth Circuit uses the eight-factor test in AMF

18   Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979) ("the Sleekcraft test").  Defendants

19   argue that because Apple Hill has become known as a geographic place, Claims 1 and 2 should be

20   analyzed under the Ninth Circuit's nominative fair use test instead.  See Adobe Systems Inc. v.

21   Christenson, 809 F.3d 1071, 1081 (9th Cir. 2015) (nominative fair use test "replaces the usual

22   Sleekcraft test as the proper measure of consumer confusion" in certain circumstances).  Plaintiff

23   counters that the nominative fair use test does not apply in this case.  The court therefore takes up

24   this question first.

25        a. Nominative Fair Use

26        "When a defendant uses a trademark nominally, the trademark will be identical to the

27   plaintiff's mark, at least in terms of the words in question."  Playboy Enterprises, Inc. v. Welles,

28   279 F.3d 796, 801 (9th Cir. 2002).  A defendant makes nominative fair use of a mark when the

12

defendant uses it as other than a trademark, to accurately describe, name, or identify the plaintiff's product.  See Toyota Motor Sales, U.S.A., Inc. v. Tabari, 610 F.3d 1171, 1175 (9th Cir. 2010) (Sleekcraft analysis doesn't apply "where a defendant uses the mark to refer to the trademarked good itself"); Ninth Circuit Civil Jury Instructions (Trademark) § 15.25.  The nominative fair use test is "designed to address the risk that [defendant's] nominative use of the mark will [lead consumers to believe] that the speaker is sponsored or endorsed by the trademark holder." Id. at 1176.

The Ninth Circuit has applied this alternative "consumer confusion" test where auto brokers used the "Lexus" trademark in their web domain names and promotional materials. Toyota Motor Sales, 610 F.3d at 1175.  Defendants "are using the term Lexus to describe their business of brokering Lexus automobiles," the Ninth Circuit observed. "[W]hen they say Lexus, they mean Lexus." Id.  Similarly, the nominative fair use test applied where two national newspapers published unauthorized polls about a popular band, though the band's name was itself trademarked. New Kids on the Block v. NewsAmerica Pub., Inc., 971 F.2d 302 (9th Cir. 1992). In that case, the Ninth Circuit reasoned:

> *A . . . problem arises when a trademark also describes a person, a place or an attribute of a product.* If the trademark holder were allowed exclusive rights in such use, the language would be depleted in much the same way as if generic words were protectable. Thus trademark law recognizes a defense where the mark is used only 'to describe the goods or services of [a] party, or their geographic origin.'

Id. at 306 (emphasis added), citing 15 U.S.C. § 1115(b)(4); see also Playboy, 279 F.3d at 802 ("To satisfy the first part of the test for nominative use, the product or service in question must be one not readily identifiable without use of the trademark. This situation arises when a trademark also describes a person, a place or an attribute of *a product* [i.e., plaintiff's product] and there is no descriptive substitute for the trademark.") (emphasis added).

However, it does not follow that every use of a trademark that also describes a place is nominative fair use, as opposed to regular fair use.  Importantly, in New Kids, the Ninth Circuit continued:

> To be sure, this is not the classic fair use case where the defendant

13

has used the plaintiff's mark to describe the defendant's own product. Here, the New Kids trademark is used to refer to the New Kids themselves. We therefore do not purport to alter the test applicable in the paradigmatic fair use case. *If the defendant's use of the plaintiff's trademark refers to something other than the plaintiff's product, the traditional fair use inquiry will continue to govern.*

Id. at 308 (emphasis added).

Here, defendants do not use the term "Apple Hill" to refer to AHG's products and/or goods from AHG member farms, but to describe a geographical place where defendants' own farm is located. See Cairns v. Franklin Mint Co., 292 F.3d 1139, 1150 (9th Cir. 2002) ("We distinguish two types of fair use: 'classic fair use,' in which 'the defendant has used the plaintiff's mark to describe the defendant's own product,' and 'nominative fair use,' in which the defendant has used the plaintiff's mark 'to describe the plaintiff's product' for the purpose of, for example, comparison to the defendant's product."); Mattel, Inc. v. Walking Mtn. Prods, 353 F.3d 792, 809-10 (9th Cir. 2003) ("defendant's use is *classic* fair use where the defendant has used the plaintiff's dress to describe or identify the defendant's own product") (emphasis in original), abrogated on other grounds by Punchbowl Inc. v. AJ Press, LLC, 90 F.4th 1022 (9th Cir. 2024); Ninth Circuit Civil Jury Instructions (Trademark) § 15.24 (Comment). Whereas nominative fair use might be an advertisement stating: "Boa Vista apples are superior to Apple Hill farms' apples," this is not that case.

The elements of the classic fair use defense as follows: (1) defendant's use of the term is not as a trademark or service mark; (2) defendant uses the term 'fairly and in good faith'; and (3) defendant uses the term only to describe its goods or services. Cairns, 292 F.3d. at 1151. In the Ninth Circuit, the classic fair use test "complements the likelihood of confusion analysis set forth in Sleekcraft" and does not replace it. Id. at 1150. This defense is "not available if there is a likelihood of consumer confusion as to the origin of the product." Id. at 1151; see, e.g., Katzkin Leather, Inc. v. Roadwire, LLC, 2022 WL 17101245 (C.D. Cal. May 6, 2022) (where court found no triable issue of fact as to consumer confusion, court did not reach classic fair use defense). Thus, the court now turns to the Sleekcraft test.

////

1          b.  <u>Sleekcraft Factors</u>

2       Plaintiff argues that the evidence shows there is a likelihood of consumer confusion

3  between its members' products and defendants' products featuring the APPLE HILL mark, i.e.,

4  "Apple Hill Family Farm."

5       Defendants counter that there are multiple material factual disputes as to the <u>Sleekcraft</u>

6  factors.  Defendants further point out that courts generally disfavor summary judgment on

7  "likelihood of confusion" grounds, "[g]iven the open-ended nature of this multi-prong inquiry."

8  <u>Reardon</u>, 683 F.3d at 1210; <u>see also</u> <u>Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand</u>

9  <u>Management, Inc.</u>, 618 F.3d 1025, 1031 (9th Cir. 2010) (citing "well-established principle" that

10  because of the intensely factual nature of trademark disputes, summary judgment is generally

11  disfavored).

12       To determine whether a defendant's use of a mark is likely to confuse consumers, courts

13  look to the eight <u>Sleekcraft</u> factors: (1) strength of the mark; (2) proximity of the goods; (3)

14  similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of

15  goods and the degree of care likely to be exercised by the consumer; (7) defendant's intent in

16  selecting the mark; and (8) likelihood of expansion of the product lines.  599 F.2d at 348-49.

17  However, the Ninth Circuit has "long cautioned that applying the <u>Sleekcraft</u> test is not like

18  counting beans." <u>Multi Time Machine, Inc. v. Amazon.com, Inc.</u>, 804 F.3d 930, 936 (9th Cir.

19  2015) (citations omitted).  It is a "pliant" test in which the "relative importance of each individual

20  factor will be case-specific," and "it is often possible to reach a conclusion with respect to

21  likelihood of confusion after considering only a subset of the [Sleekcraft] factors . . . [which do]

22  not purport to be exhaustive[.]" <u>Brookfield Communications, Inc. v. West Coast Entertainment</u>

23  <u>Corp.</u>, 174 F.3d 1036, 1054 (9th Cir. 1999).  The overall question is whether "[d]efendants' actual

24  practices were likely to produce confusion in the minds of consumers about the origin of the

25  goods in question." <u>Marketquest Group, Inc. v. BIC Corp.</u>, 862 F.3d 927, 932 (9th Cir. 2017)

26  (cleaned up, citation omitted).

27      **Strength of mark**.  Plaintiff's mark is strong in certain ways: coined by AHG in 1964, it

28  has been in continuous use since then in association with AHG members' goods and products,

and has been registered as a trademark twice (the '541 and '321 Regs.) in connection with various food and non-food items sold by AHG members.  However, as discussed above, the public now associates Apple Hill with a geographic place, replete with road signs to the "Apple Hill area," and there is a genuine dispute of fact as to the term's secondary meaning.  This factor also is the subject of a genuine dispute of fact.

**Proximity of goods.**  Plaintiff's member farms and Boa Vista Orchards are competitors, and they promote and sell similar farm-related goods and products.  (See ECF No. 82 at 14 (defendants acknowledge that "some of" the goods overlap and are identically substantial)).  The competitive proximity of their products is therefore high, and this factor favors plaintiff.  See Katzkin, 2022 WL 17101245, *6.

**Similarity of mark.**  Plaintiff points out that multiple Boa Vista Farms product labels and boxes display the name "Apple Hill Family Farm," a phrase which "completely incorporates" the registered trademark APPLE HILL.  Plaintiff argues that the similarity of the phrases, coupled with the similar goods and products of Boa Vista Farms and AHG member farms, are likely to cause consumer confusion.  Defendants counter that, while both marks contain the term Apple Hill, they are different enough that consumers can tell them apart.

"Because the similarity of the marks is such an important question," the Ninth Circuit has "developed . . . detailed axioms to guide this comparison: "first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences[.]"  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205-06 (9th Cir. 2000) (internal citations omitted).  Here, the Boa Vista label appears in the marketplace as a colorful realistic image of two apples (the "twin apple design") with the words "Boa Vista Orchards" displayed centrally in large letters; the phrase "Apple Hill Family Farm" is displayed in smaller font above.  (See ECF No. 77-1 at 5.)  The AHG logo is more stylized, featuring an outline of an apple in a red and white graphic design; the phrase "Apple Hill" appears in large prominent letters with the word "Growers" in cursive underneath.  (See id.)  In short, the logos are dissimilar in appearance in the marketplace; however, the similarities (shared use of the trademarked phrase

16

1  Apple Hill) weigh more heavily than the differences.  This raises an issue of fact as to the

2  likelihood of consumer confusion due to the marks' similarity.

3      **Evidence of actual confusion.**  On this factor, the Ninth Circuit's model jury instruction

4  provides: "If defendants' use of the plaintiff's trademark has led to instances of actual confusion,

5  this strongly suggests a likelihood of confusion.  If . . . there is a very large volume of sales, but

6  only a few isolated instances of actual confusion, [a jury] may find that there has not been

7  substantial actual confusion."  Ninth Circuit Civil Jury Instructions (Trademark) § 15.18.

8  Plaintiff's evidence of actual confusion does not relate to product sales; rather, AHG cites

9  secondhand reports from two AHG farms that some members of the public were confused by a

10  Boa Vista billboard on Highway 50 that advertised "APPLE HILL OPEN," and visited AHG

11  member farms in the off-season, when they were closed.  (PF 31.)  Putting aside the hearsay

12  issues with this evidence, it is closer to a "few isolated instances" than substantial actual

13  confusion of AHG and Boa Vista farms or products.  Moreover, such evidence is not inconsistent

14  with consumers simply viewing Apple Hill as a location and taking the highway exit to visit

15  farms in that area.  Arguing against actual confusion, defendants cite their survey evidence

16  suggesting that only a small percent of regional consumers who see "Apple Hill Family Farm" on

17  a Boa Vista apple juice label associate the juice with AHG.  (Ezell Decl., ¶ 16.)  While actual

18  confusion is not required for a finding of likelihood of confusion, there is a genuine dispute of

19  fact as to this factor as well.

20      The court need not reach the other factors to conclude that summary judgment as to

21  likelihood of confusion is not warranted; there is a genuine dispute of fact as to this portion of the

22  Sleekcraft test.  Plaintiff is not entitled to summary judgment on its § 1114 claim.

23      Also, because "the fair use defense only comes into play once the party alleging

24  infringement has shown by a preponderance of the evidence that confusion is likely," KP

25  Permanent Make-up, 408 F.3d at 608-09, the court does not reach whether the classic fair use

26  defense applies.

27    B.  Count II: Trademark Infringement under § 1125(a)

28      Plaintiff AHG asserts that, in addition to its registered trademarks discussed above, it

17

1    owns common law, unregistered rights in the APPLE HILL mark which defendants have

2    infringed.  Plaintiff brings this claim against all defendants, including the Estate of Mason

3    Visman, over the website he created at applehillca.com.

4          Unfair competition through infringing an unregistered trademark or infringing trade dress

5    is handled under 15 U. S. C. § 1125(a).  The general test of liability under the trademark law is

6    likelihood of confusion.  *See* 15 U.S.C. §§ 1114(1), 1125(a).  "[T]he ultimate test is whether the

7    public is likely to be deceived or confused by the similarity of the marks . . . . Whether we call the

8    violation infringement, unfair competition or false designation of origin, the test is identical—

9    is there a 'likelihood of confusion?'" <u>New W. Corp. v. NYM Co. of Cal., Inc</u>., 595 F.2d 1194,

10   1201 (9th Cir. 1997); <u>see</u> Ninth Circuit Civil Jury Instructions (Trademark) § 15.5.

11         As with Claim 1, plaintiff applies the <u>Sleekcraft</u> factors while defendants argue that

12   consumer confusion should be analyzed under the doctrine of nominative fair use.  The discussion

13   above is applicable here: The <u>Sleekcraft</u> factors apply, though classic fair use is an available

14   defense, given that, aside from any common law rights plaintiff may have in the term[4],

15   defendants are not using it to refer to plaintiff or its products.  As above, there multiple genuine

16   disputes of fact as to the <u>Sleekcraft</u> factors, and plaintiff is not entitled to summary judgment on

17   Count II.

18         C.  <u>Count III: Cybersquatting</u>

19         AHG seeks summary judgment on its cybersquatting claim against the Estate of Mason

20   Visman.

21         The Ninth Circuit has explained that

22                [c]ybersquatting is the Internet version of a land grab. Cybersquatters
                 register well-known brand names as Internet domain names in order
23                to force the rightful owners of the marks to pay for the right to engage
                 in electronic commerce under their own name.
24

25   <u>Interstellar Starship Services, Ltd. v. Epix, Inc.</u>, 304 F.3d 936, 946 (9th Cir. 2002) (citation

26

27   _____

     [4] The court does not reach whether AHG has protectable common law rights in the term "Apple
28   Hill," a discussion which would cover much of the same ground as above, and raise the same
     factual issues, as to secondary meaning.

omitted).  Under the Anticybersquatting Consumer Protection Act (ACPA), a person is liable to the owner of a protected mark if the cybersquatter has (1) a bad faith intent to profit from the mark, and (2) registers or uses a domain name that is identical or confusingly similar to a distinctive mark.  Id., citing 15 U.S.C. § 1125(d)(1)(A).  "A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation."  Id.  To assist courts in their bad faith determination, Congress enumerated nine nonexclusive factors for consideration.[5]  § 1125(d)(1)(B)(i).

---

[5] The ACPA's nine nonexclusive factors are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

1    However, courts "need not march through the factors"; rather, "the most important grounds for

2    finding bad faith are the unique circumstances of the case." <u>Solorio v. CareCo, LLC</u>, 2024 WL

3    3915234, *17 (C.D. Cal. July 2, 2024) (cleaned up, citations omitted).  The statute also contains a

4    safe harbor provision that excludes a finding of "[b]ad faith intent ... in any case in which the

5    court determines that the person believed and had reasonable grounds to believe that the use of

6    the domain name was a fair use or otherwise lawful." § 1125(d)(1)(B)(ii).

7        In its motion for summary judgment, plaintiff notes that it is undisputed that, in March

8    2014, Mason registered the domain name applehillca.com and operated the website at that name.

9    (PF 27.)  Prior to 2014, plaintiff AHG had previously registered the domain name applehill.com

10    and used it for many years to promote goods and services.  (PF 40.)  Plaintiff argues that Mason's

11    website was confusingly similar to its own and incorporated its APPLE HILL mark.

12        As to bad faith intent to profit, plaintiff submits that the most relevant statutory factors

13    are:

14        (IV) the person's bona fide noncommercial or fair use of the mark in
         a site accessible under the domain name; [and]

15

16        (V) the person's intent to divert consumers from the mark owner's
         online location to a site accessible under the domain name that could
         harm the goodwill represented by the mark, either for commercial
17        gain or with the intent to tarnish or disparage the mark, by creating a
         likelihood of confusion as to the source, sponsorship, affiliation, or
18        endorsement of the site[.]

19    <u>See</u> § 1125(d)(1)(B)(i).  As to (IV), AHG argues that Mason's use of the applehillca.com domain

20    does not qualify as bona fide noncommercial use, as he made a profit from it.  <u>See</u> DF 97 (from

21    2012-2017, prior to the filing of the complaint, Mason Visman made approximately $5,000 from

22    listing on his website).  However, because Apple Hill is also known as a geographic place,

23    Mason's use of the phrase in a domain name suggestive of a place in California (applehillca.com)

24    raises fair use issues, as discussed above.  The court finds this factor is neutral.

25        As to (V), AHG argues that Mason intended his website to "divert customers from

26    plaintiff's website www.applehill.com and harm the goodwill represented by the Apple Hill

27    mark." (ECF No. 79-1 at 23.)  Neither AHG's website nor Mason's website directly sell goods or

28    services.  Rather, AHG's site provides advertising and promotion for AHG members and third

                                      20

1    parties, while Mason's site features the BOA "twin apple" logo, provides the address for an

2    "Apple Hill Visitor Center" at Boa Vista Orchards, and includes multiple links to the Boa Vista

3    website. (PF 16, 39; DF 92, 93.) While Mason's website could conceivably divert potential

4    customers from AHG's website, plaintiff has not shown how "goodwill represented by the Apple

5    Hill mark" could be harmed in the process. There is no evidence that Mason was trying to pass

6    off Boa Vista products as AHG member products, for instance. Nor does plaintiff show (or even

7    claim) that Mason registered or was using the domain as "an attempt to gain leverage in the

8    dispute between the parties." See Gizmo Beverages, Inc. v. Park, 2019 WL 141461, **8-9 (C.D.

9    Cal. Jan. 9, 2019). Nor is there any claim or evidence of the standard cybersquatting tactic:

10   attempting to sell registered domain names containing "Apple Hill" to AHG or another party.

11   (See M. Visman Decl., ¶ 43, ECF No. 77-5.) In his declaration, Mason stated that he "believed

12   that providing more information to potential visitors to Apple Hill on my site benefits every

13   business in the Apple Hill area; a rising tide lifts all boats." (M. Visman Decl., ¶ 38.)

14       Plaintiff does not address the other seven bad faith factors, which it deems irrelevant to

15   these circumstances. (ECF No. 87 at 13.) Overall, especially considering the dual nature of

16   Apple Hill as a trademark and a geographic place, the evidence marshalled to show that Mason

17   acted in bad faith is weak. Viewing the evidence in the light most favorable to the nonmoving

18   party, plaintiff is not entitled to summary judgment on its cybersquatting claim.

19       IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

20       Defendants move for summary judgment on all claims and also move for the cancellation

21   of AHG's '541 and '321 registrations.

22       A.    Personal Liability of Kandi and Mason Visman

23       Defendants assert that Kandi and Mason Visman should not be subject to personal liability

24   for the actions of defendant corporation EDO on Claims 1, 2, 4, and 5.[6]

25   _____

26   [6] In November 2019, the district judge formerly assigned to this case granted a motion to dismiss
     Brad Visman and Kandi Visman as individual defendants in the original complaint, as AHF "fails
27   to plead facts that specifically tie Defendants Brad and Kandi Visman to the infringing conduct
     and show they knowingly and substantially participated in such conduct." (ECF No. 15 at 6.)
28   The FAC superseded that complaint, and defendants filed an answer and counterclaims.

Claims 1 and 2 allege infringement of AHG's registered marks and common law rights in the APPLE HILL marks.  Counts 4 and 5 allege unfair competition under California statutory and common law.

The Lanham Act imposes liability on "[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any . . . name . . . which is likely to cause confusion[.]" 15 U.S.C. § 1125(a)(1).  Corporate officers and directors that personally authorize, direct, or are otherwise directly involved in a company's infringing conduct may be individually liable for the company's trademark infringement.  Comm. for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 823 (9th Cir. 1996); see also Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1021 (9th Cir. 1985) ("The officer must personally take part in infringing activities or specifically direct employees to do so.").  "[C]ourts have held company officers jointly and severally liable for the infringement, along with the company when they are the 'moving, active conscious force behind the [company's] infringement.'"  Solorio, 3915234, *11 (citation omitted); see Facebook, Inc. v. Power Ventures, Inc., 844 F.3d 1058, 1069 (9th Cir. 2016) ("Cases finding personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct, or the 'central figure' in the challenged corporate activity.").  Plaintiff must demonstrate that individual defendants "directed or participated in the infringement directly."  Solorio, 3915234, *11 (collecting cases).

In the Ninth Circuit, "state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act and can be analyzed under the same standard."  Hyphy Music Inc. v. Cruz, 2025 WL 1580909, *6 (E.D. Cal. June 4, 2025), citing Cleary v. News Corp., 30 F.3d 1255, 1262–63 (9th Cir. 1994).

### 1. Kandi Visman

AHG argues that Kandi Visman should be personally liable because she is a corporate officer of EDO, reasoning that this includes "management with respect to the sale of numerous products with labels which contain AHG's APPLE HILL trademark."  (ECF No. 83 at 6.)  But AHG offers no evidence of her direct involvement in allegedly infringing activity, let alone being

the "guiding spirit" behind such activity.  In an August 2022 declaration, Kandi Visman stated that she was "aware that some of the products sold by El Dorado use the term Apple Hill Family Farm on their label."  (ECF No. 77-6, ¶ 4.)  She further declared: "I am not involved in managing El Dorado" and "was not involved in designing the label containing Apple Hill Family Farm, nor was I involved in the decision to use it."  (Id., ¶¶ 5, 6.)  "My tasks at El Dorado include picking up trash at the farm, helping in food service, and running errands,' and "I have never been a member of AHG."  (Id., ¶¶ 7, 8.)  This evidence is essentially undisputed.  (See Plff.'s Response to DF (PDF) 47-50, ECF No. 83-1.)  Even viewing the evidence in favor of the nonmoving party plaintiff, individual defendant Kandi Visman is entitled to summary judgment on Claims 1, 2, 4, and 5.

### 2.  Mason Visman

Plaintiff clarifies that Mason Visman is not being charged in Claim 1 of the FAC.  (ECF No. 83 at 6.)  Thus, defendants' argument as to this claim is moot.

As to Claims 2, 4, and 5, plaintiff acknowledges that Mason is not liable for the acts of EDO as an officer, director, or employee.  (ECF No. 83 at 2.)  Rather plaintiff contends that Mason is personally liable for his own actions in operating and maintaining the website at applehillca.com.  Plaintiff's theory of liability is "premised on his infringement of [AHG's] unregistered service marks, and the manner in which his Web Site directs and funnels confused consumers to the Boa Vista Web Site and to Boa Vista Orchards[.]"  (Id. at 6-7.)  In reply, defendants do not argue that Mason should be summarily dismissed on this theory of liability.  Given the genuine disputes of fact discussed above, summary judgment as to Mason on the infringement and unfair competition claims should be denied.

### B.  Cybersquatting

Defendants argue that summary judgment should be granted on Count 3, the cybersquatting claim against Mason Visman, because no reasonable jury could find that Mason acquired or used the Apple Hill domain name in bad faith.  Thus, the court revisits this claim, this time drawing all reasonable inferences in favor of the nonmoving party, AHG.

To recap, under the ACPA, a person is liable to the owner of a protected mark if the

cybersquatter has (1) a bad faith intent to profit from the mark, and (2) registers or uses a domain name that is identical or confusingly similar to a distinctive mark.  Id., citing 15 U.S.C. § 1125(d)(1)(A).  "A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation."  Id.  To assist courts in their bad faith determination, Congress enumerated nine nonexclusive factors for consideration. § 1125(d)(1)(B)(i).  Earlier in these findings, the undersigned found that factor (IV) (bona fide noncommerical use or fair use) was neutral.  The undersigned further found a lack of plaintiff's evidence on factor (V) (intent to divert consumers to a domain name that could harm the mark's goodwill).

In their motion, defendants address other relevant bad faith factors:

Factor (I) concerns the trademark or other intellectual property rights of the person, if any, in the domain name.  "This factor takes account of the fact that the same or similar marks can peacefully coexist in the marketplace without a likelihood of confusion when used in widely different product or service lines[.]"  4 McCarthy on Trademarks and Unfair Competition § 25A:54 (5th Ed.).  It "should also point in the direction of good faith . . . if a domain name holder . . . can prove it had a bona fide intent to use accompanied by the filing of an ITU application to register the designation as a mark with the USPTO[.]"  Id.

The FAC's allegations concern two domain names, applehillca.com and applehillmap.com.  (FAC, ¶¶ 37-47.)  In 2014, when Mason registered these two domain names (DF 78), AHG had the '541 registration that covered fresh fruits and fruit juice.  At that time, Mason had a pending 2012 trademark application to register the mark APPLE HILL for advertising and directory services, namely, providing a website featuring links to the websites of others.  (DF 67.)  The application was filed on an "intent to use" basis.  (DF 68.)  In August 2013, AHG sent a demand letter to Mason accusing him of infringing AHG's trademark and demanding he abandon the domain name, remove all references to Apple Hill from his website, and abandon the pending trademark application.  (DF 69.)  Mason retained trademark counsel who responded to AHG's letter, stating he would not comply with the demand.  (DF 72.)  His trademark application was allowed on July 15, 2014.  (DF 79.)  AHG did not oppose the application, and the PTO did not cite AHG's registration for fruit and fruit juices against the application, which

Mason "took . . . as confirmation of what my lawyer had told them, i.e., that they did not have a case." (DF 80, 81; see M. Visman Decl., ¶ 24.) Apple, Inc. opposed the application and, in settlement, Mason amended it by limiting it to promoting "goods and services originating in the Apple Hill area of California." (DF 82.) Mason filed his Statement of Use on July 17, 2014. (DF 83.) The PTO rejected it because it determined that "the primary significance of the term 'APPLE HILL' is geographic and applicant's services come from the geographical place named in the mark." (DF 84; M. Visman Decl., Exh. 7, ECF No. 77-5 at 51.) Mason amended the application, and the PTO accepted it and issued a registration on February 3, 2015. (DF 86, 87.)

This evidence strongly suggests that Mason was not acting in bad faith when he registered and used domain names containing the phrase Apple Hill. When he registered them in 2014, he had a pending trademark application for his intended use in advertising and promotion, which AHG's registration for fruits and fruit juices did not obviously foreclose. When AHG challenged him for these activities, he retained counsel and acted on his lawyer's advice to continue pursuing the application. Subsequently, his application was allowed with no challenge from AHG[7]; when another party challenged it, he amended the application, and a registration subsequently issued. It is not clear what more he could have done to show a "bona fide intent to use" the mark for different purposes than the '321 registration. This factor weighs heavily against a finding of bad faith.

Factor (III) "is similar to Factor (I) in that it recognizes that the legitimate use of a domain name in commerce is a good indicator of a good faith intent." 4 McCarthy on Trademarks and Unfair Competition § 25A:56 (5th Ed.). A defendant's bona fide prior use must be "prior" to the plaintiff's challenge and the dispute. Id. Here, Mason began using the term Apple Hill in domain names and for websites in 2012, before the AHG's 2013 demand letter and the dispute over the domain names currently at issue. His stated intent in creating the website in 2012 was to "provide a source for information about Apple Hill . . [for] potential visitors to Apple Hill." (M. Visman Decl., ¶ 12.) This factor also weighs against the bad faith required of a cybersquatter.

---

[7] In 2016, AHG petitioned to cancel Mason's registration, a proceeding suspended pending the outcome of this lawsuit. (DF 121, 122.)

As discussed above, the evidence for Factors (IV) and (V) is insufficient to show bad faith.

Factor (VII) considers whether an alleged cybersquatter "obtain[s] one or more names using misleading false contact information" because he "wants to profit without being easily identifiable and served with process." 4 McCarthy on Trademarks and Unfair Competition § 25A:60 (5th Ed.). Here, Mason made no attempt to conceal his identity or address; rather, his contact information at Boa Vista Orchards was included in his trademark application and on the website itself. (DF 101, 102.) This factor weighs strongly against bad faith.

Factor (VIII) concerns "a marker of the classic type of cybersquatting": "the warehousing of many domain names (sometimes hundreds or thousands) consisting of various identical or similar combination of the marks of others." 4 McCarthy on Trademarks and Unfair Competition § 25A:61 (5th Ed.). Though Mason registered multiple domain names containing the term Apple Hill, including the two at issue here, there is no evidence he engaged in large-scale warehousing of names containing the trademarks of third parties. This factor weighs against bad faith.

Based on the application of these factors, and viewed in the light most favorable to the nonmoving party, the undersigned concludes that no reasonable jury could find Mason liable for cybersquatting.[8] The Estate of Mason Visman is entitled to summary judgment on this claim.

C.  Nominative Fair Use

Defendants next argue for summary judgment on claims 2, 4, and 5 against Mason Visman because his use of Apple Hill in his website domains is nominative fair use.

As discussed above, the undersigned finds the Sleekcraft factors should be applied in this case, and that doing so results in multiple genuine and material disputes of fact concerning consumer confusion. Defendants are not entitled to summary judgment on this basis.

D.  Counterclaims I & II: Cancellation of Registrations

Lastly, defendants move for the cancellation of the '541 and '321 registrations and all

---

[8] The court does not reach whether the safe harbor provision applies, as "the safe harbor defense should be invoked very sparingly and only in the most unusual cases." GoPets Ltd. v. Hise, 657 F.3d 1024, 1033 (9th Cir. 2011) (quotation marks and citation omitted).

common law rights in APPLE HILL mark, arguing that AHG's trademark rights have been forfeited due to naked licensing.

As the Ninth Circuit has explained,

> As a general matter, trademark owners have a duty to control the quality of their trademarks. McCarthy § 18:48. . . .
>
> "Naked licensing" occurs when the licensor "fails to exercise adequate quality control over the licensee." Barcamerica [Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589,] 596. Naked licensing may result in the trademark's ceasing to function as a symbol of quality and a controlled source. Id. (citing McCarthy § 18:48). We have previously declared that naked licensing is "inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." Id. at 598. "Consequently, where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.'" Id. at 596 [citation omitted].

FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 515-16 (9th Cir. 2010).

In Freecycle, the Court affirmed a grant of summary judgment for plaintiff ("FS") based on a finding of trademark abandonment due to naked licensing. Id. 512. On summary judgment, the Court noted,

> [t]he key question is therefore whether [defendant] TFN produced any evidence to raise a material fact issue as to whether it: (1) retained contractual rights to control the quality of the use of its trademark; (2) actually controlled the quality of the trademark's use; or (3) reasonably relied on FS to maintain the quality. Barcamerica, 289 F.3d at 596–98 (upholding trademarks where a licensor is familiar with the licensee and reasonably relies on the licensee's own quality control efforts).

Id., n.1. As to (3), "courts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's own efforts to control quality." Barcamerica, 298 F.3d at 598, citing Morgan Creek Prods., Inc. v. Capital Cities/ABC, Inc., 1991 WL 352619 (C.D. Cal. Oct. 28, 1991); see also Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co., 334 F.2d 667 (7th Cir. 1964) (upholding trademark where licensor's name appeared on trademark product label, and product was sold under license for forty years without complaints about quality). On summary judgment, "the proponent of a naked license of trademark abandonment must meet a stringent standard of proof." Freecycle, 626 F.3d at 514, citing Barcamerica, 298 F.3d at 596

1    (internal quotation marks omitted).

2        Here, defendants argue that AHG has produced no evidence "reflecting active quality

3    monitoring and control" of its members' products that bear the APPLE HILL mark, and has

4    "engaged in naked licensing for decades."  (ECF No. 88 at 11.)  In his declaration, Brad Visman

5    states from personal knowledge that during the fifty years EDO was a member of AHG, AHG did

6    not have a written trademark license agreement with its members, and no AHG officer or

7    employee was responsible for quality control of members' goods.  (B. Visman Decl., ¶¶ 13-15,

8    ECF No. 77-7.)  As of 2014, AHG had a written license agreement for its marks (see DF 22) and,

9    in discovery, AHG produced its 2022 license agreement with a provision for quality control.

10   (Leininger Decl., ¶ 5, Exh. 2, ECF No. 77-4.)  However, there is no evidence that AHG

11   periodically conducts inspections of member farms' products to determine compliance with

12   AHG's own quality standards.  (See DF 23.)  See Barcamerica, 289 F.3d at 498 (affirming finding

13   of naked licensing where licensor of trademarked wine name "did not make even [the] minimal

14   effort" to sample wines on an annual basis for quality control).

15       Plaintiff does not argue that it engages in periodic "formal quality control" over goods

16   bearing the APPLE HILL mark; rather, it focuses on the long-term relationships between AHG

17   and its member-growers.  (ECF No. 83 at 19.)  AHG cites its Articles of Incorporation, filed in

18   1969, which lists "promot[ing] the establishment of a reputation for high inherent quality of

19   Apple Hill agricultural products" as a "primary purpose" of the company.  (Delfino Decl., Exh. 2,

20   ECF No. 83-3.)  Christopher Delfino, owner of AHG member Delfino Farms and a former board

21   member and officer of AHG, testifies that

22           [m]embership is limited to qualified growers within or immediately
             adjacent [to] the Membership Areas. . . . If the Board determines that
23           the qualifications for membership have been met, the Membership
             and Ethics Committee members visit the applicant's property to
24           make assessment respecting suitability for membership . . . as set
             forth in the Bylaws.
25
             . . .
26
             Due to the nature of the organization, and proximity of Members to
27           one another, violations and/or quality issues are generally brought
             quickly to the attention of the Board by other members.  In addition,
28           some Committee members conduct routine inspections of orchards,

                                            28

> farms, and facilities of Members.  Many times, problems are caught early on, before any products are offered for sale by the Member, because issues such as watering, acreage planted, and maintenance of farm and orchard property . . . are readily observable.  When any non-compliance or quality issue respecting a Member's products is observed, the Board is notified and the Member contacted. . . . If the Member fails to comply with the governing documents and the quality standards, then the membership is terminated or not renewed.

(Delfino Decl., ¶¶ 9, 13.)  Similarly, Susan Boeger, co-owner of longtime AHG member Boeger Winery, testifies that "[t]o promote and establish a reputation for high quality of APPLE HILL goods, AHG membership was limited to those who produced and sold goods of the highest standards."  (Boeger Decl., ¶ 14, ECF No. 83-2.)  "Quality control for APPLE HILL products was also a common subject for discussion at Apple Hill General Meetings, where groundwork for later action was laid."  (Id., ¶ 17; see ¶ 18 (describing quality control efforts after 1997 E. coli outbreak in non-AHG juice).

    In these circumstances, a genuine dispute of fact exists as to whether the close, long-term relationship between AHG and its member farms using the APPLE HILL mark amounted to a reasonable reliance on the farms' quality control measures, or alternatively, whether AHG failed to exercise sufficient control over the many and varied products labeled with its mark.  See Blue Magic Products, Inc. v. Blue Magic, Inc., 2001 WL 34098657, *5 (E.D. Cal. Sept. 5, 2001) (in naked licensing analysis, "the amount of control required by the licensor varies with the circumstances and is limited to that which is necessary to prevent public deception") (internal citation omitted), citing Transgo, 768 F.2d at1018 (finding that the licensor was entitled to rely on licensee's own quality control where licensor was familiar with ability and integrity of licensee). Viewing all facts in favor of the nonmoving party plaintiff, defendants are not entitled to summary judgment on this counterclaim.

    Accordingly, IT IS HEREBY RECOMMENDED THAT:

1.   Defendants' motion for summary judgment (ECF No. 77) be GRANTED IN PART as follows:

    a.   Kandi Visman be granted summary judgment on Claims 1, 2, 4, and 5;

    b.   The Estate of Mason Visman be granted summary judgment on Claim 3

1    (cybersquatting); and

2         c.   The motion be otherwise DENIED.

3    2.   Plaintiff's motion for summary judgment (ECF No. 79) be DENIED.

4    These findings and recommendations are submitted to the United States District Judge

5 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6 after being served with these findings and recommendations, any party may file written

7 objections with the court and serve a copy on all parties.  Such a document should be captioned

8 "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

9 within the specified time may waive the right to appeal the District Court's order.  Martinez v.

10 Ylst, 951 F.2d 1153 (9th Cir. 1991).

11 Dated:  July 8, 2025

12                                    _____
                                     CAROLYN K. DELANEY
13                                   UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18    2/apple2085.f&r

19

20

21

22

23

24

25

26

27

28

30